FILED
U.S. DISTRICT COURT
AUGUSTA CIV.

2018 SEP 24 PM 3:07

CLERK_____
SO. DIST OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

RALPH WALKE,                        *
                                    *
        Plaintiff,                  *
                                    *
        v.                          *         CV 317-046
                                    *
MICKEY MALONE and CHRISTOPHER       *
PARKS, Individually and in          *
their Official Capacities as        *
Laurens County Sheriff              *
Deputies, and John Does 1-3,        *
                                    *
        Defendants.                 *

_____

O R D E R

_____

Before the Court in the captioned matter is a motion for summary judgment filed by Defendants Mickey Malone and Christopher Parks. Upon consideration of the record, the parties' briefs, and the relevant law, the motion for summary judgment (doc. no. 20) is **GRANTED.**

I. BACKGROUND

A.    Overview

This case arises out of the arrest of Plaintiff Ralph Walke in the early morning hours of July 9, 2015 in Laurens County, Georgia. At that time, Defendants Mickey Malone and Christopher Parks, deputies of Laurens County Sheriff's

Department, responded to a 911 call reporting that a man named Ralph Walke had wrecked his truck, was drunk, and had just left his residence on a motorcycle. Ultimately, Plaintiff was arrested by the deputies on a misdemeanor charge of obstructing law enforcement, a violation of O.C.G.A. § 16-10-24(a).

The incident was captured on the dashboard camera in Deputy Malone's patrol car. Thus, while the Court must view evidence in the light most favorable to Plaintiff, it need not do so when Plaintiff's version of events is plainly contradicted by the video and audio of the incident. See Scott v. Harris, 550 U.S. 372, 378-81 (2007). Accordingly, the Court will describe the interaction between Plaintiff and the deputies from its viewing of the video, interspersed with deposition testimony of the parties and the admitted facts set forth in Defendants' Statement of Undisputed Facts ("DSUF"), doc. no. 20-2, when necessary for context. For the most part, the facts are not in dispute.

### B. Factual Background

On July 9, 2015, Laurens County 911 received a call at 12:44 a.m. from 1185 Walke Dairy Road, Plaintiff's residence. The woman stated: "I want to report someone on the road that's drinking and driving. . . . Ralph Walke just left on a motorcycle. He's got his white truck in the ditch at the

four-way stop and he's drunk. Had to go pick him up. He's drunk, so I just wanted to let you all know." (Defs.' Mot. for Summ. J., Ex. C; DSUF ¶¶ 3-4.) The 911 dispatcher advised Deputy Malone of the call and dispatched him to the scene. (DSUF ¶ 6.) Deputy Parks also responded in a separate vehicle. (Parks Dep., Doc. No. 25, at 26-27.) When Deputy Malone did not find a crashed white truck at the four-way stop, he traveled 50 yards down the road. Deputy Parks was about three minutes behind him. (Id. at 31-32.) The officers alerted dispatch as follows:

> Officer One[1]: "This hill on the left, when you turn right onto Walke Dairy at the four-way, this hill right here, I see a bunch of lights and a car in the trees. I think this is going to be it."

> Officer Two: "I'm going to be in a field -- the back of a field. If you -- you're coming from 80 and turn right onto Walke Dairy at the four-way -- in a field on the left. I'm not sure if this is it or not. There's a [car] in the woods and a tractor. I think he probably drove off into the trees and got stuck and tried to pull himself out."

Defs.' Mot. for Summ. J., Ex. C, at 8.)

Deputy Malone turned off of the public road onto a private dirt road toward the lights that he had observed from the road. In doing so, he activated his blue lights. (DSUF ¶ 12.) When Deputy Malone found Plaintiff, Plaintiff was using his tractor and a tow strap to try to dislodge a stuck

---

[1] The record is not definitive as to which deputy was Officer One and which was Officer Two.

white truck.  (Id. ¶¶ 13-14.)

Despite the obvious police presence, Plaintiff remained atop the tractor.  (See generally Defs.' Mot. for Summ. J., Ex. E, Video No. 1.)  Deputy Malone, who was in uniform, exited his patrol car and approached the tractor, directing and gesturing to Plaintiff to turn off the tractor and come over to him.  (Id.)  Deputy Malone continued to approach Plaintiff, issuing the same directive five times (e.g., "turn that off and come over here").  (Id.)  Plaintiff continued to operate the tractor and began shouting back at the deputy. Plaintiff can be heard to say: "You're on my property.  What do you want?"  At that point, Plaintiff came down from the tractor without turning it off.[2]  (Id.)

As Plaintiff came down from the tractor, he had a motorcycle helmet in one hand and a flashlight in the other.[3] (Id.; see also Malone Dep., Doc. No. 26, at 31.)  Plaintiff complained about the deputy's flashlight, telling him that he did not like lights in his face.  (See Video No. 1.)  As

_____

[2]  Of note, Plaintiff admits at deposition: "I was ignoring them, just trying to get my truck out because didn't want to talk to them.  Didn't want to talk to anybody."  (DSUF ¶ 15.)

[3]  Later, it would be learned that Plaintiff had had an argument with the woman who lived in his home and had left in his truck, but he got it stuck on his own property ½ mile from the residence.  He walked back to his house and drove his motorcycle to the tractor shed to get his tractor, which he drove to his truck.

4

Plaintiff approached, Deputy Malone instructed him to put the helmet down. (<u>Id.</u>) Plaintiff flung it down and stated "fine" with his arm raised above his head. (<u>Id.</u>; <u>see also</u> Pl.'s Dep., Doc. No. 22, at 50.)

Plaintiff then stood within striking distance of Deputy Malone. (<u>See</u> Video No. 1.) Plaintiff is a large and very tall man; the deputy came up to Plaintiff's shoulder. Deputy Malone asked Plaintiff how his truck got where it was. Plaintiff only answered: "What's it to you? Who are you? Why you on my property?" (<u>Id.</u>) Deputy Malone then instructed Plaintiff to "put that down," referring to Plaintiff's flashlight. (<u>Id.</u>) Deputy Malone repeated that command. Meanwhile, Plaintiff was gesturing and stated: "You got a flashlight in your hand, I'm out here with a flashlight trying to get my truck out." (<u>Id.</u>) Deputy Malone told Plaintiff for a third time: "Put your flashlight down." (<u>Id.</u>) Plaintiff continued to exclaim repeatedly that this was his property and the deputy was trespassing. Plaintiff did not put down his flashlight.[4] (<u>Id.</u>)

At this time, Deputy Parks was approaching the two men. Deputy Malone said to Plaintiff: "Alright, do me a favor real

---

[4] Plaintiff testified at deposition that he put down the flashlight (Pl.'s Dep. at 43), but this statement is contradicted by the video showing him holding the flashlight until the deputies grabbed his arms to handcuff him (<u>see</u> Video No. 1).

quick, turn around. . . . Put your hands behind your back."[5]

(Id.) At first, Plaintiff slapped away from Deputy Malone, but he appeared to comply within seconds when both deputies grabbed him to put on the handcuffs. (Id.) Plaintiff continued his protest by cursing and calling them "trespassing SOBs." (Id.) Before they could secure the handcuffs, Plaintiff broke free of the deputies and became resistant. The deputies and Plaintiff circled around together as the deputies attempted to bring Plaintiff down by tripping him; that did not work. The deputies continued to try to restrain Plaintiff's arms. Plaintiff then complied and allowed himself to be cuffed. Plaintiff's resistance lasted about ten seconds.[6] Plaintiff was then placed in the back of a patrol car. (Id.)

Both deputies testified that they could smell alcohol on Plaintiff when they were close to him. (Malone Dep. at 33,

---

[5] Deputy Malone testified that he perceived the flashlight in Plaintiff's hand to be a potential weapon and decided to detain Plaintiff for the safety of the officers and Plaintiff. (Malone Dep. at 32-33 ("At that point I was still concerned for my safety. . . . I did not want to get hurt and I didn't want something to escalate further and cause anybody to get hurt."), 50, 52, and 54 ("I didn't feel safe continuing on without putting him in handcuffs.").)

[6] Plaintiff's claim that he acted "perfectly normal" and that there was "no struggle to put handcuffs" on him (Pl.'s Resp. to DSUF ¶¶ 33, 35, 37) is clearly contradicted by the video.

44; Parks Dep. at 36.) Rather than administer a field sobriety test themselves, they called for a state trooper, per the department's policy, to work the crash as a DUI incident. (Malone Dep. at 33-34; Parks Dep. at 46-47.)

It took the state trooper anywhere between 35 to 60 minutes to arrive. (See Malone Dep. at 48; Parks Dep. at 35.) In any event, it had been over two hours from the time that Plaintiff had an opportunity to consume alcohol and the time that the state trooper administered a breathalyzer test. (DSUF ¶ 63.) The test was positive for alcohol, but Plaintiff was not above the legal limit.[7] (Id. ¶ 66.) Plaintiff was therefore not arrested for DUI by the state trooper; rather, the Laurens County deputies arrested him for misdemeanor obstruction.

While he was in custody, Plaintiff did not ask for or receive medical attention. (Id. ¶ 73.) Moreover, Plaintiff told the state trooper when he arrived that he was not hurt but the handcuffs were too tight.[8] (Id. ¶ 62.)

C. **Procedural Background**

Plaintiff originally filed a complaint and an amended

---

[7] Plaintiff admitted to drinking alcohol earlier that evening. (Pl.'s Dep. at 29.)

[8] Plaintiff's claim that the deputies' actions toward him were "clearly violent" (Pl.'s Resp. to DSUF ¶ 41) is contradicted by the video.

complaint in the Superior Court of Laurens County. Defendants timely removed the case to this Court on August 2, 2017. In the Amended Complaint, Plaintiff claims that Defendants violated his Fourth and Fourteenth Amendment rights by "detaining, arresting, and prosecuting him for absolutely no lawful reason or cause." (Am. Compl., Doc. No. 1, ¶ 38.) Plaintiff also includes a claim of excessive force. (Id. ¶ 40.) Finally, Plaintiff also claims that his First Amendment rights were violated because he was arrested "in response to the content of [his] speech, namely his lack of desire to interact with officers . . . ."[9] (Id. ¶ 41.)

Defendants have filed a motion for summary judgment on all of Plaintiff's claims. The Clerk gave Plaintiff notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 23.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

---

[9] Plaintiff also asserts several state law claims based upon his arrest and prosecution. (Am. Compl. ¶¶ 28, 30-34.)

8

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In considering a motion for summary judgment, all facts and reasonable inferences are to be construed in favor of the nonmoving party. Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004). Moreover,

[t]he mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoted source omitted) (emphasis supplied). The party opposing the summary judgment motion, however, "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue to be tried." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

### III. DISCUSSION

In the Amended Complaint, Plaintiff cites 42 U.S.C. §§ 1983, 1985 and 1986 to support his federal claims against the Deputy Defendants. Plaintiff has sued the deputies in both their official and individual capacities. Through their summary judgment motion, Defendants argue that Plaintiff has failed to show any evidence to support claims under §§ 1985 and 1986, that they are entitled to Eleventh Amendment immunity as to any official capacity claims, and that they are entitled to qualified immunity on all of Plaintiff's § 1983 claims.

### A.    42 U.S.C. §§ 1985 & 1986

Section 1985 prohibits engaging in conspiracies "for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws . . . . 42 U.S.C. § 1985(3). In order to maintain a claim under § 1985(3), a plaintiff must show that a defendant was motivated by racial or class-based "invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798 (1971), cited in Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1337 (11th Cir. 1999). Section 1986 provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. §

1985], are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do . . . ." 42 U.S.C. § 1986, <u>cited in</u> <u>Park v. City of Atlanta</u>, 120 F.3d 1157, 1159 (11th Cir. 1997). Thus, § 1986 claims are derivative of § 1985 violations. <u>Parks</u>, 120 F.3d at 1159-60. That is, "§ 1986 requires the existence of a § 1985 conspiracy." <u>Id.</u> at 1160.

Here, Defendants move for summary judgment on the basis that Plaintiff has failed to present any evidence of a conspiracy or racial or class-based invidious discrimination. Plaintiff did not address Defendants' motion on these claims in his response and thus, he has failed to show that there exists a genuine issue for trial. In any event, the record reveals no such evidence. For these reasons, Defendants are entitled to summary judgment on Plaintiff's §§ 1985 and 1986 claims.

### B. Official Capacity Claims

Defendants claim that they are entitled to Eleventh Amendment immunity from all federal claims asserted against them in their official capacities. The Eleventh Amendment protects a state from being sued in federal court without a state's consent. <u>Carr v. City of Florence</u>, 916 F.2d 1521, 1524 (11th Cir. 1990). Eleventh Amendment immunity also bars suits brought against employees or officers sued in their

11

official capacities for monetary damages because those actions actually seek recovery from state funds. Kentucky v. Graham, 473 U.S. 159, 165-68 (1985); Hobbs v. Roberts, 999 F.2d 1526, 1528 (11th Cir. 1993).

"To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the state,' which includes agents and instrumentalities of the state." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (citations omitted). Whether a defendant is an "arm of the state" is determined by examining his function in a particular context. Id. This entails analyzing four factors: 1) how state law defines the entity; 2) what degree of control the state maintains over the entity; 3) where the entity derives its funds; and 4) who is responsible for judgments against the entity. Id. (citations omitted).

The Court need not provide a Manders analysis in this case, particularly because Plaintiff fails to oppose Defendants' contention on this point in brief. Instead, the Court simply references other cases that have examined a sheriff deputy's duties vis à vis state law in similar cases and found Eleventh Amendment immunity: Manders, 338 F.3d 1304 (holding that a Georgia sheriff is considered an "arm of the State" when performing law enforcement functions such as detaining and arresting suspects); Burgest v. Colquitt Cnty.,

177 F. App'x 852 (11th Cir. 2005) (affirming summary judgment in favor of sheriff's employees based on Eleventh Amendment immunity on claims related to the plaintiffs' detention and arrest); <u>Richardson v. Quitman Cnty., Ga.</u>, 912 F. Supp. 2d 1354 (M.D. Ga. 2012) (dismissing official capacity claims against deputies involving strip searches, an investigatory stop and arrests); <u>Townsend v. Coffee Cnty., Ga.</u>, 854 F. Supp. 2d 1345, 1352 (S.D. Ga. 2011) (concluding that "investigatory stops and arrests fall squarely within the traditional law-enforcement responsibilities of a sheriff and his deputies" and thus, the deputy defendant was entitled to Eleventh Amendment immunity).

Here, the Deputy Defendants acted as agents of the State in investigating and arresting Plaintiff. Thus, Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment.

**C. 42 U.S.C. § 1983**

Plaintiff also brought individual capacity claims against the Deputy Defendants under 42 U.S.C. § 1983. Section 1983 provides "a method for vindicating federal rights elsewhere conferred." <u>Graham v. Connor</u>, 490 U.S. 386, 393 (1989). Accordingly, for a plaintiff to prevail on his § 1983 claim, he must show that a person acting under the color of state law deprived him of a federal right. <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1303 (11th Cir. 2001).

In this case, Plaintiff claims that his arrest violated his constitutional rights to be free of unreasonable seizures and excessive force and to free speech, invoking the Fourth and First Amendments to the United States Constitution, respectively. At summary judgment, Defendants contend that they are entitled to qualified immunity on Plaintiff's claims.

Qualified immunity is a judicially-created affirmative defense under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lumley v. City of Dade City, 327 F.3d 1186, 94 (11th Cir. 2003) (citations omitted). Here, Defendants were acting within the scope of their discretionary authority when they engaged in the conduct presently challenged by Plaintiff because making an arrest is a quintessential discretionary act of law enforcement officials. See, e.g., Howell v. City of Lithonia, 397 F. App'x 618, 620 (11th Cir. 2010); Peach State Recovery, Inc. v. Goodwin, 290 F. App'x 233, 234 (11th Cir. 2008). Accordingly, the burden shifts to Plaintiff to demonstrate that qualified

immunity is not appropriate. See id.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014). "The first [prong] asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001) (alterations omitted)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." Id. at 1866 (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "Courts have discretion to decide the order in which to engage these two prongs . . . [b]ut under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." Id. (citations omitted). Because the Court has determined that Plaintiff cannot establish a constitutional violation as a matter of law, the Court need not address the clearly established prong.

1.  False Arrest

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A "seizure" occurs "when there is a governmental termination of freedom of movement through means

intentionally applied." <u>Brower v. Cnty. of Inyo</u>, 489 U.S. 593, 596-97 (1989).

Generally, a seizure is reasonable if it is supported by probable cause. <u>Croom v. Balkwill</u>, 645 F.3d 1240, 1246 (11th Cir. 2011) ("Traditionally, seizures by law enforcement have been reasonable under the Fourth Amendment only if justified by probable cause to believe that the detainee committed a crime."). In fact, an arrest made with probable cause is "an absolute bar to a subsequent constitutional challenge to the arrest." <u>Gates v. Khokhar</u>, 884 F.3d 1290, 1297 (11th Cir. 2018) (quoted source omitted).

"Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." <u>Ortega v. Christian</u>, 85 F.3d 1521, 1525 (11th Cir. 1996) (citation omitted); <u>United States v. Floyd</u>, 281 F.3d 1346, 1348 (11th Cir. 2002) (stating that probable cause to arrest exists when a law enforcement official has "facts and circumstances within [his] knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime" (quotation marks omitted)). Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." <u>Illinois v. Gates</u>, 462 U.S.

213, 243 n.13 (1983). Probable cause determinations are guided by reviewing the totality of the circumstances. Id. at 233.

In the context of a qualified immunity defense, all that is required of an arresting officer is "arguable probable cause to believe that a person is committing a particular public offense; that is, where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiffs." Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001) (quoted sources omitted); Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). This standard recognizes that a law enforcement official may make a reasonable but mistaken judgment regarding probable cause.

In the case at bar, the Deputy Defendants are entitled to qualified immunity on Plaintiff's claims of false arrest if arguable probable cause exists. Thus, this Court must determine whether a reasonable officer in the same circumstances and possessing the same knowledge as the deputies could have believed that probable cause existed to arrest Plaintiff for misdemeanor obstruction.

In Georgia, a person commits the offense of "Obstruction

of Officers" if he "knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his [] official duties . . . ." O.C.G.A. § 16-10-24(a). A person commits the offense by refusing to comply with reasonable instructions, or by acting belligerently and confrontationally during an investigatory stop. Draper v. Reynolds, 369 F.3d 1270, 1276 (11th Cir. 2004).

In the case at bar, the following facts are *undisputed*.[10] The Deputy Defendants were dispatched to the area of a four-way stop on Walke Dairy Road and told that a drunk driver had crashed his white truck and was now driving a motorcycle. In the early morning hours on a dark road, the deputies noticed lights in the vicinity of the four-way stop. Upon investigation, they found a stuck white truck being dislodged by a man on a tractor. The man on the tractor refused to comply with Deputy Malone's repeated instruction to turn off the tractor and come down to talk to him. When the man did comply, he approached Deputy Malone holding a motorcycle helmet and a flashlight. The man was confrontational,

---

[10] The Court derived most of the relevant facts from the video of the incident. A few facts are derived from an undisputed transcript of the dispatcher's calls and the deposition testimony of the parties. Any attempt by Plaintiff to create a genuine dispute of these facts in his response to Defendants' Statement of Undisputed Fact is clearly contradicted by the video. Thus, as far as the Court is concerned the relevant facts are undisputed.

insisting that the deputies should not be on his property. The man refused to comply with a repeated directive to drop the flashlight. Deputy Malone perceived the larger, confrontational man with a potential weapon as a threat and therefore decided to handcuff him. The man resisted. Given Plaintiff's confrontational manner, his refusal to comply with reasonable instructions, and his active resistance to putting on the handcuffs, any reasonable officer in the deputies' position would have believed that probable cause existed to arrest Plaintiff for misdemeanor obstruction. See Draper, 369 F.3d at 1276-77 (finding ample probable cause to arrest for obstruction where the arrestee was confrontational and refused to comply with officer's instructions during a legitimate traffic stop); Haygood v. State, 789 S.E.2d 404, 407 (Ga. Ct. App. 2016) (finding probable cause where the arrestee interfered with the lawful investigation of a domestic disturbance call by refusing to comply with officers' instruction to leave the home and then struggling with the officers).

Plaintiff's sole response to the claim of qualified immunity is his insistence that the Deputy Defendants had no right to be on his private property in the first instance, and once he told them to leave, they had to discontinue their investigation. Plaintiff's contention in this regard is not

19

only erroneous but ill-conceived.

The dispatch of the Deputy Defendants to the area was legitimate police business. On that call, the deputies saw lights and a car in the woods from Walke Dairy Road and entered the property to investigate the report that a drunk driver had crashed a white truck in the vicinity and was now driving a motorcycle. Contrary to Plaintiff's assertion, they were well within their investigative authority to enter the property.[11] See, e.g., United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006) (stating that the Fourth Amendment is not implicated by entry upon private land when officer proceeded down driveway that provided access to house, went to the front door, and knocked on it); United State v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991) ("Reasonable suspicion cannot justify the warrantless search of a house . . . but it can justify the agents' approaching the house to question the occupants." (citations omitted)).

---

[11] It is worth noting that the deputies never entered Plaintiff's home or surrounding curtilage. Rather, they discovered Plaintiff on an open dirt road surrounded by trees, ½ mile from his residence. Thus, it is doubtful that the Fourth Amendment is even implicated since they were essentially standing in an open field. See, e.g., United States v. Taylor, 458 F.3d 1201, 1208 (11th Cir. 2006) (recognizing that "[t]he Fourth Amendment does not extend protection to open fields, which includes any unoccupied or undeveloped area beyond the 'immediate domestic establishment of the home'" (quoting Oliver v. United States, 466 U.S. 170, 180 n.11 (1984))).

Nor were the officers required to leave upon command by the property owner. According to Plaintiff, the deputies "should not have stuck around in defiance of his orders and tried to talk to [him], smell [his] breath, approach [him], put [him] in handcuffs, or otherwise do anything more on [his] property other than leave." (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., Doc. No. 24, at 3.) Plaintiff's position is untenable. It implies an expectation that law enforcement should ignore evidence of illegal activity on private property simply at the owner's behest. In essence, Plaintiff posits that the officers should have ignored a possible drunk driving incident because they were told to leave by the suspected perpetrator. Indeed, had the officers simply walked away at Plaintiff's first insistence without further inquiry, they would have been in dereliction of their duties to protect the citizens of Laurens County. It is also noteworthy that Plaintiff was belligerent and did not cooperate with the deputies at any point. Thus, the deputies were stymied from the beginning in their reasonable investigation of a reported incident.

In conclusion, Defendants are entitled to qualified immunity for Plaintiff's Fourth Amendment claim of false

21

arrest.[12]

2. <u>Excessive Force</u>

In his Amended Complaint, Plaintiff alleges: "Defendants violated Plaintiff's rights by using unlawful and excessive force against Plaintiff by handcuff (sic) and arresting Plaintiff while trying to trip him." (Am. Compl. ¶ 40.)

In determining whether the force used in effectuating an arrest is reasonable, the Court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Thornton v. City of Macon</u>, 132 F.3d 1395, 1400 (11th Cir. 2000) (quoting <u>Graham</u>, 490 U.S. at 396). "An officer will be entitled to qualified immunity if his actions were objectively reasonable, that is, if an objectively reasonable officer in the same situation could have believed that the force used was not excessive." <u>Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)).

─────────────────

[12] Because Plaintiff's arrest was constitutional, he cannot state a claim for false imprisonment or malicious prosecution. <u>See</u> <u>Atterbury v. City of Miami Police Dep't</u>, 322 F. App'x 724, 727 (11th Cir. 2009) (noting that the existence of probable cause to make an arrest forecloses the arrestee's claims of false imprisonment and malicious prosecution).

22

In this case, the video clearly reveals that the deputies' use of force in effectuating the arrest of a larger, confrontational man who was refusing to drop an item that could be used as a weapon was reasonable. In fact, the only point at which the officers became "forceful" by trying to trip Plaintiff to the ground occurred when he actively resisted the arrest.

In excessive force cases, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the position of the defendant officer] to conclude the force was unlawful." Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoted source omitted). In this case, the Court readily concludes as a matter of law that **no reasonable officer** would conclude that the use of force against Plaintiff was unreasonable. Accordingly, the Deputy Defendants are entitled to qualified immunity on Plaintiff's claim of excessive force.[13]

    3.    First Amendment

Plaintiff alleges in his Amended Complaint that he was arrested "in response to the content of [his] speech, namely his lack of desire to interact with officers[,] in order to

---

[13]    Plaintiff presents no argument in support of his excessive force claim in response to the motion for summary judgment. The claim is therefore not only unsupported by the undisputed evidence, it has essentially been abandoned.

chill Plaintiff's speech." (Am. Compl. ¶ 41.) This claim is defeated by the existence of probable cause. The Eleventh Circuit has held that if an officer had arguable probable cause to arrest a plaintiff for disorderly conduct, the officer is also entitled to qualified immunity from the plaintiff's First Amendment claim. Redd v. City of Enterprise, 140 F.3d 1378, 1383 (11th Cir. 1998). "When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested." Id. Moreover, Plaintiff in this case has not presented any evidence of protected speech. His claim hinges upon a finding that his detention and arrest were unreasonable; this is simply not the case. Accordingly, Defendants are entitled to qualified immunity on the First Amendment claim as well.

## IV. CONCLUSION

Upon the foregoing, Defendants' motion for summary judgment (doc. no. 20) is **GRANTED** with respect to all of Plaintiff's federal claims. The Court declines to exercise jurisdiction over Plaintiff's state law claims[14]; thus, they

---

[14] Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims under which it has original jurisdiction.

are **DISMISSED WITHOUT PREJUDICE**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants and **CLOSE** this case. Costs are taxed against Plaintiff.

      **ORDER ENTERED** at Augusta, Georgia, this _24th_ day of September, 2018.

_____
UNITED STATES DISTRICT JUDGE